# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

**Christine Schmidt-Gossen,**

         Plaintiff,

v.

                     Civil No. 10-2406 (DSD/JJG)

                   **REPORT AND RECOMMENDATION**

**Michael J. Astrue**,

Commissioner of Social Security,

         Defendant.

---

JEANNE J. GRAHAM, United States Magistrate Judge

      Plaintiff Christine Schmidt-Gossen (Schmidt-Gossen) brings this action contesting the denial of her application for disability insurance benefits (DIB) under the Social Security Act. *See* 42 U.S.C. § 405(g).  Schmidt-Gossen is represented by Daniel A. Eller, Esq.  Defendant is represented by Lonnie F. Bryan, Assistant U.S. Attorney.  This matter is before the Court on cross-motions for summary judgment.  (Doc. Nos. 6, 16).  The case was referred to this Court for a Report and Recommendation pursuant to 28 U.S.C. § 636.  For the reasons set forth below, the Court recommends that Schmidt-Gossen's motion for summary judgment be granted in part and denied in part; and Defendant's motion for summary judgment be denied.

## I.   BACKGROUND

      Schmidt-Gossen protectively filed an application for disability insurance benefits on April 26, 2005, alleging a disability onset date of January 13, 2004.  (Tr. at 13, 74-76.)  She alleged disability from the following:  mitral valve prolapse, allergies and right wrist injury. (Tr. at 80-81.)  She is married and has one child.  (Tr. at 438-39.)  Schmidt-Gossen worked as a

Certified Nursing Assistant in nursing homes and home health care from 1995 until January 2004. (Tr. at 81-82.) Then, she quit working due to allergies. (Tr. at 81.) She later returned to work part-time, but her allergies were worse. (Tr. at 130.) Schmidt-Gossen testified at a hearing before an ALJ, and the ALJ issued an unfavorable decision on March 27, 2008. (Tr. at 666-95, 13-22.) The Appeals Council denied review, and Schmidt-Gossen filed this action for judicial review on June 17, 2010.

### A.     Medical Records

Records of Schmidt-Gossen's allergies begin in October 2003, when she developed a rash on her left ring finger, when she was frequently using latex gloves. (Tr. at 362.) She was evaluated by Dr. Robert P. Callen at Cambridge Medical Center, who assessed dermatitis probably caused by a metal allergy. (*Id.*) Schmidt-Gossen was later diagnosed with a latex allergy. (Tr. at 464.)

Schmidt-Gossen returned to Dr. Callen on January 8, 2004, this time with swelling of the lips. (Tr. at 361.) She still had a rash on her left ring finger, which had improved but not resolved. (*Id.*) She had a similar swelling of the lips about a year ago. (*Id.*) Dr. Callen suspected underlying allergies, and he prescribed Prednisone. (*Id.*)

Upon referral by Dr. Callen, Dr. Lowell Becker saw Schmidt-Gossen on January 12, 2004, and she said her rash returned whenever the Prednisone wore off. (Tr. at 359.) Dr. Becker noted that she did not have any other allergic symptomatology, except for mild seasonal allergies. (*Id.*) He also noted that she was under a lot of stress from working two jobs, for as many as 96 hours per week. (*Id.*) The next week, Schmidt-Gossen reported having a sudden

feeling of her throat closing.  (Tr. at 357.)  She was working with a patient who had a latex indwelling catheter, and wondered if that was the problem.  (*Id.*)

When Schmidt-Gossen followed up with Dr. Callen two weeks later, he noted that, according to her verbal report, her allergy tests were positive for a strong reaction to "caines" and petrochemicals.  (Tr. at 355.)  He also noted she had been in the hospital the previous week for gastroenteritis, and she had also felt foggy and confused, but she was starting to improve. (*Id.*)  On examination, her mouth, throat and lips were normal.  (*Id.*)  Dr. Callen gave her a work note to be assigned to a different client, because she was concerned about mold or some other allergens in her client's house.  (*Id.*)   In February, she tested positive for an allergy to phenylenediamine.[1]  (Tr. at 354.)  She had intermittent swelling of her lips, and soap caused a flare of dermatitis on her left ring finger.  (*Id.*)  Dr. Callen recommended avoiding environments where her symptoms flared, and to use topical steroids and Benadryl.  (*Id.*)

On February 25, 2004, Dr. Becker noted that Schmidt-Gossen had "unexplained, unusual" episodes, including incidents where she woke up at night with difficulty breathing and a funny sensation in her throat.  (Tr. at 353.)  She had similar episode when she was exposed to perfume.  (*Id.*)  And, her eye doctor was concerned about her rapid change in vision.  (*Id.*) Dr. Becker noted she had a history of anxiety issues.  (*Id.*)  He gave her Nexium samples and an albuterol inhaler.  (*Id.*)  About a week later, Schmidt-Gossen reported that her lips swelled when she was working in her barn, but Benadryl seemed to help.  (Tr. at 352.)  She also complained of intermittent chest pain.  (*Id.*)  Examination was normal, with the exception of a slightly swollen lower lip.  (*Id.*)  Dr. Becker recommended traditional allergy testing.  (*Id.*)  The allergy tests

---

[1]     Phenylenediamine is a chemical that is primarily used as a dye intermediate and as a dye. http://www.epa.gov/ttnatw01/hlthef/phenylen.html

showed a reaction to box elder and maple trees, and a slight reaction to house dust mites and hormodendrum.  (Tr. at 351.)

When Plaintiff saw Dr. Becker on April 12, 2004, she reported that she had contacted Mayo Clinic and would be evaluated there.  (Tr. at 350.)  She stopped taking Benadryl, because it made her feel funny.  (*Id.*)  She had an episode of mild difficulty breathing when she smelled fertilizer outside.  (*Id.*)  She continued to have intermittent lip and throat swelling, particularly around newspapers and books, which was worse when she was outside her home.  (*Id.*)  She felt things were getting worse, but the rash on her finger was almost completely resolved.  (*Id.*)  Dr. Becker confronted Schmidt-Gossen about whether there were psychological aspects to her problems.  (*Id.*)  She agreed that she was anxious and depressed about her situation.  (*Id.*)

Schmidt-Gossen referred herself to Mayo Clinic for further evaluation in April 2004. (Tr. at 349.)  On the drive to Mayo Clinic, she was in a car accident and injured her right wrist, and an x-ray showed displaced radial styloid fracture.  (Tr. at 313, 349.)  While she was in the hospital, it was discovered that she had a mitral valve prolapse.  (Tr. at 299.)  On May 10, 2004, Schmidt-Gossen agreed to an arthroscopic reduction and pinning of her right wrist.  (Tr. at 313.) In August, she reported her wrist was doing fairly well, and she was back to doing some activities, including riding her horse, but she was still having difficulty with hand weakness, and was referred for hand therapy.  (Tr. at 311.)  The next month, she noted that she developed wrist pain after riding her horse for five to ten minutes and when pushing a cart.  (Tr. at 310.) In October, an EMG confirmed a radial sensory neuropathy on the right wrist.  (Tr. at 307.)

Two months later, Schmidt-Gossen reported not only wrist pain, but widespread pain throughout her body.  (Tr. at 305.)  On examination, her tenderness was particularly at the

fibromyalgia tender points.  (*Id.*)  Dr. Keith Bengtson at the Mayo Hand Clinic recommended a whole body functional capacity evaluation, but it was denied by her insurance company.  (Tr. at 304-05.)  Dr. Bengtson then gave permanent restrictions of "no lifting greater than 5 pounds of the right hand, push/pull is limited to 10 pounds, suggest sedentary level of work, and no repetitive twisting activities or any twisting greater than 2 pounds of torque with the right hand." (Tr. at 304.)

Shortly after her car accident in May 2004, Schmidt-Gossen resumed her allergy evaluation at Mayo Clinic.  She tested positive for allergies to caine mix, phenylenediamine, dog, certain trees, mold and Russian thistle.  (Tr. at 234, 247, 297.)  She had a positive skin test to latex, but two perfume challenge tests were negative.  (Tr. at 232-34.)

Schmidt-Gossen developed a rash with approximately twenty lesions over her back and arms in August 2004.  (Tr. at 348.)  Dr. Appert, a dermatologist at Mayo Clinic, recommended a triamcinolone cream, which resolved all of her lesions.  (Tr. at 247.)  She intermittently developed new papules, but they responded to the cream.  (*Id.*)  Dr. Appert diagnosed probable papular dermatitis.  (*Id.*)

Also that month, Schmidt-Gossen reported that she had problems with vomiting for the last year-and-a-half, after exposure to a smell that did not agree with her, usually perfumes. (Tr. at 279, 281.)  She had no problems if she stayed in her house and avoided perfumes.  (*Id.*) Schmidt-Gossen's mother attended one of her medical visits with her and questioned whether some of Schmidt-Gossen's symptoms could be caused by "nerves," due to marital stress.  (Tr. at 284.)  In December 2004, Dr. Daniel Maddox at Mayo Clinic questioned whether anxiety or somatoform could be contributing to some of her spells and vomiting.  (Tr. at 275.)

Schmidt-Gossen underwent a psychiatric evaluation with Dr. Douglas Praus at Psychiatric and Behavioral Health Services on December 3, 2004. (Tr. at 343-44.) Dr. Praus noted that Schmidt-Gossen's chemical sensitivities and allergies seemed to start around the same time that she was caring for a very demanding client and her marital situation was worsening. (Tr. at 343.) Schmidt-Gossen reported that she cried easily, was irritable, slept more, and eating made her nauseous, which she attributed to chemicals in food. (*Id.*) She reported anxiety with shortness of breath, increased heart rate, dizziness and flushed feelings. (*Id.*) She also reported getting sick from certain scents. (*Id.*)

On mental status examination, Schmidt-Gossen was somewhat loud at times, with a dramatic demeanor. (Tr. at 344.) Her affect was sad, anxious and angry, and thought form was somewhat vague at times. (*Id.*) She was alert and fully oriented, and recall and attention were intact. (*Id.*) Dr. Praus diagnosed major depressive disorder, probable atypical eating disorder, probable panic disorder with agoraphobia, probable post traumatic stress disorder,[2] and narcissistic and histrionic traits. (*Id.*) He assessed a GAF score of 50.[3] (*Id.*) Schmidt-Gossen declined an antidepressant for fear of side effects and allergies, and requested Xanax. (*Id.*) Dr. Praus did not think Xanax was a good solution and referred her for psychotherapy. (*Id.*)

In 2005, she continued to be evaluated at Mayo Clinic and Cambridge Medical Center, and it is undisputed by the parties that no one could find a cause of her reported symptoms. For example, in August 2005, Schmidt-Gossen was tested for food intolerances, but she had a

---

[2]     Schmidt-Gossen's social history indicates that her first husband was abusive, and they had an eighteen-month-old son who drowned. (Tr. at 343.)

[3]     A GAF score of 41-50 indicates "[s]erious symptoms . . . or any serious impairment in social, occupational or school functioning . . . ." *Pate-Fires v. Astrue*, 564 F.3d 935, 938 n.2 (8th Cir. 2009) (quoting *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. Am. Psychiatric Ass'n 1994).

reaction to a placebo of plain water.  (Tr. at 235.)  Schmidt-Gossen reported having difficulties finding a job because she had various reactions, including a facial rash when working on a computer, stomach upset and headaches from perfume on co-workers, and conjunctivitis from handling newspapers.  (Tr. at 337, 342.)  She also had difficulty in secretarial positions due to her wrist injury.  (Tr. at 339.)  In March 2005, Dr. Becker started Schmidt-Gossen on an antidepressant, because she was very depressed.  (*Id.*)

Schmidt-Gossen began seeing a psychologist, Dr. James Tuorila at Central Minnesota Counseling Center, on April 25, 2005.  (Tr. at 172-73.)  The report from his initial evaluation is not in the Social Security Administrative Record.  In a letter dated May 16, 2005, Dr. Tuorila noted he diagnosed Schmidt-Gossen with moderate to severe clinical depression, secondary to her chronic health problems.  (Tr. at 173.)  He noted her symptoms included excessive fatigue/sleep, sense of hopelessness, suicidal thoughts, depressed mood, diminished interest in most activities, feelings of worthlessness, and diminished ability to concentrate with short-term memory impairment.  (*Id.*)  He opined that she could not maintain employment of any type, but he encouraged her to volunteer part-time, if she felt able.  (*Id.*)  On February 6, 2006, Dr. Tuorila wrote a letter, at Schmidt-Gossen's request, stating it was his opinion that her symptoms were not psychologically based but were secondary to her chemical exposure.  (Tr. at 399.)

In the meantime, Dr. Charles Grant reviewed Schmidt-Gossen's medical records on August 1, 2005, at the request of the Social Security Administration ("SSA").  (Tr. at 174-81.)  He opined that Schmidt-Gossen could lift and carry twenty pounds occasionally; ten pounds frequently; stand and/or walk six hours in an eight-hour workday; sit six hours in an eight-hour workday, limited push and pull with the upper extremities, and a right hand lifting restriction of

five pounds.   (Tr. at 174-79.)   Dr. Grant's opinion was affirmed by Dr. Aaron Mark on March 30, 2006.  (Tr. at 375-77.)

Dr. R. Owen Nelsen, a psychologist, reviewed Schmidt-Gossen's medical records at the request of the SSA, and completed a Psychiatric Review Technique Form ("PRTF") and Mental Residual Functional Capacity Form on August 22-23, 2005.  (Tr. at 182-99.)  On the PRTF form, he indicated that Schmidt-Gossen had an affective disorder that caused mild restrictions in activities of daily living and maintaining social functioning, and moderate difficulties in maintaining concentration, persistence or pace.  (Tr. at 185, 192.)  He opined that Schmidt-Gossen had the mental residual functional capacity to perform routine, repetitive and three to four step uncomplicated instructions with ordinary levels of supervision.   (Tr. at 198.) Dr. Nelsen's opinion was affirmed by Dr. Ray Conroe on March 29, 2006.  (Tr. at 378-80.)

In October 2005, Dr. Becker noted Schmidt-Gossen was going to court in her workman's compensation case "secondary to her questionable disability from her allergies," which she alleged was caused by exposure while working with a client in Marco Island, Florida.  (Tr. at 336.)  Dr. Becker stated that her only documented allergies were phenylenediamine, latex, dust, mold and trees, and that a perfume challenge test was negative.  (*Id.*)

Nine months later, Schmidt-Gossen saw Dr. Callen for complaints of shortness of breath, and chest tightness that seemed to coincide with starting Cymbalta.  (Tr. at 646.)  She also reported dizziness and racing heart.  (*Id.*)  The previous day, Schmidt-Gossen had been out working with her horses, and went to the emergency room when she felt faint.  (*Id.*)  She reported that she was sedentary other than riding her horse.  (*Id.*)  Dr. Callen assessed tachycardia and probable anxiety, noting that Schmidt-Gossen appeared depressed and anxious.

(*Id.*)  He prescribed Xanax, and also recommended that she follow-up with cardiac stress testing.  (*Id.*)  She then had a cardiovascular consultation with Dr. V. Mankad at Mayo Clinic.  (Tr. at 540-52.)  Dr. Mankad thought her chest pain was probably due to anxiety or an adverse reaction to an antidepressant, but he recommended a stress test, which Schmidt-Gossen said she would arrange herself.  (Tr. at 542.)

In August 2006, Schmidt-Gossen traveled to Benson, Arizona to be evaluated by Dr. Michael Gray at Progressive Healthcare Group.  (Tr. at 462-72.)  She reported that she was presently working as a switchboard operator up to eight hours per month.  (Tr. at 470.)  She completed an extensive health questionnaire, in which she identified approximately twenty environmental exposures in her current employment, and approximately forty different symptoms over time, including psychological symptoms and many symptoms related to the head, eyes, ears, nose and throat.  (Tr. at 485, 490-94.)  As part of Dr. Gray's evaluation, Schmidt-Gossen underwent a pulmonary function test, neurological tests, and a number of lab tests.  (Tr. at 460-61, 454-59, 419-34, 443-53).[4]

On January 16, 2007, Dr. Gray reported his findings and conclusions to Schmidt-Gossen.  (Tr. at 438-42.)  He diagnosed the following conditions:  hypothyroidism, status post wrist fracture, chemical allergies, history of herniated disc, latex allergies, sinusitis and rhinitis, mitral valve prolapse, small airways obstruction,[5] toxic encephalopathy,[6] and immunologic toxicity.  (Tr. at 438.)

---

[4]     Dr. Gray's interpretation of the test results is quoted in Section II (A) below.

[5]     The smallest air passages in the lungs are called bronchioles.  http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001970/  Bronchiolitis is swelling and mucus buildup in the bronchioles, usually due to a viral infection.  *Id.*  Asthma is another inflammatory

Dr. Gray made the following conclusions:

> It is a reasonable medical and scientific certainty that Christine Schmidt-Gossen's exposure to various chemicals when she was working for Intrepid with a quadriplegic beginning in November 2002 are a substantial contributing factor in Christine Schmidt-Gossen's compromised health particularly those health problems related to chemical allergies and latex allergies.
>
> It is a reasonable medical and scientific certainty that Christine Schmidt-Gossen's exposure to conditions of damp indoor environments with significant mold amplification in Florida in February 2002 when she was working for Intrepid with the previously mentioned quadriplegic and Christine Schmidt-Gossen's exposure to significant mold amplification in Minnesota beginning in May 2003 when she was working for Sunrise with a 91 year old diabetic lady are a substantial contributing factor in Christine Schmidt-Gossen's compromised health particularly those health problems related to sinusitis and rhinitis, small airways obstruction, toxic encephalopathy, and immunologic toxicity.

(Tr. at 441.)   Dr. Gray opined that Schmidt-Gossen had a 50% permanent partial disability. (Tr. at 441-42.)  He recommended avoiding exposure in many public environments.  (Tr. at 663.)

In October 2006, Schmidt-Gossen had a new job in the Radiology Department at Fairview Systems.  (Tr. at 642.)  She reported that the training for the job required her to be in a basement and handle records.  (*Id.*)  This caused her GI upset, slight swelling and itching of the lips, thickness in her throat, and confusion and forgetfulness.  (*Id.*)  She also reported more problems with her wrist from filing.  (*Id.*)  She also complained of reactions from handling CD stickers and working with x-ray films.  (Tr. at 632.)  Dr. Becker recommended continued use of albuterol.  (Tr. at 642.)

---

disorder of the airways, which in sensitive people can be triggered by breathing in allergy-causing substances.  http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001196/

6      Toxic encephalopathy is a meningeal irritation that may follow extracerebral infections. *Jablonski's Dictionary of Syndromes & Eponymic Diseases* 198 (2nd ed. 1991).  Synonyms for the term include Dupre syndrome, pseudomeningitis, and serous meningitis.  *Id.*

Schmidt-Gossen brought the lab reports from Dr. Gray to Dr. Becker in December 2006.

(Tr. at 631.)  Dr. Becker stated:

> She comes back with a huge variety of laboratory studies, almost all of which were abnormal including antithyroid antibody titers, which were normal at the Mayo Clinic.  Also she had some blood tests that were positive for EB virus infections for cytomegalic and for yeast, but it says right in the notes that these all could be normal and related to a past infection.

(*Id.*)

Schmidt-Gossen saw a chiropractor, Dr. Arthur Volker, from December 2006 through October 2007, for various complaints of neck, arm, back and hip pain.  (Tr. at 516-27.)  In March 2007, Schmidt-Gossen complained of soreness in her right arm after working eighteen-hour shifts due to a snowstorm.  (Tr. at 522.)  Two months later, she sought emergency treatment after she fell off her horse.  (Tr. at 613-21.)  She suffered a "minimally displaced fracture of the right mid clavicle."  (Tr. at 620.)

Schmidt-Gossen attended a routine annual follow up for mitral valve prolapse at Mayo Clinic on May 4, 2007.  (Tr. at 537-38.)  She reported tremendous stress in her life, for which she was taking Xanax.  (Tr. at 537.)  Her stress was related to legal battles after a car accident, and her loss of health coverage and difficulty getting another job.  (Tr. at 537-38.)  There was no significant change in her mitral valve prolapse.  (Tr. at 538.)

Schmidt-Gossen called Dr. Becker's office in July and August 2007, to report symptoms that she was having only when at work, including shortness of breath and coughing, "balance issues," headaches, congestion and itching, dry tongue, throat feeling full, and mentally "twisted" and confused.  (Tr. at 581, 584, 590.)

The next month, Schmidt-Gossen saw Dr. Bengtson at the Mayo Hand Clinic for widespread pain, and she questioned whether she might have fibromyalgia.  (Tr. at 536.)  On examination, she had all eighteen fibromyalgia tender points and tenderness unrelated to the fibromyalgia tender points.  (*Id.*)  Dr. Bengtson diagnosed fibromyalgia and referred Schmidt-Gossen to a fibromyalgia treatment program, which she began in October.  (Tr. at 536, 528-29.)  Her initial fibromyalgia symptoms began after her wrist injury, and then progressed.  (Tr. at 528.)  She had many symptoms including sensitivity to touch, tingling and numbness, fatigue, poor sleep, headaches, blurred vision, TMJ-like symptoms, bruxism, tinnitus, vertigo, lightheadedness, imbalance, palpitations, sweating, muscle spasms, restless legs, impaired mobility, weight gain, joint swelling, allergies, heat and cold intolerance, decreased concentration, mood swings, anxiety, crying spells, depressed mood, irritability and anhedonia.  (*Id.*)  It does not appear from the record that Schmidt-Gossen attended more than one session of the treatment program.

In December 2007, Schmidt-Gossen's psychologist, Dr. Tuorila, completed a Medical Opinion regarding her ability to do physical work-related activities.  (Tr. at 655-58.)  He opined that she was limited to lifting and carrying less than ten pounds occasionally; standing or walking less than two hours in an eight-hour workday; sitting less than two hours during an eight-hour workday; never stooping, crouching or climbing ladders; occasionally doing the following:  twisting, climbing stairs, rotating and flexing her neck, repetitive use of foot controls, handling and fingering; and she had environmental restrictions.  (Tr. 655-57.)  He also stated:

> Patient is experiencing mod to severe symptoms of clinical depression secondary to multiple life threatening health problems diagnosed by multiple providers.  Severely limits all work activities.  Patient can not clean her own home and has anxiety when driving.

(Tr. at 658.)

**B.     Administrative Hearing**

Schmidt-Gossen testified as follows at a hearing before an ALJ on January 16, 2008. (Tr. at 666.)  She has a GED and is a Certified Nursing Assistant and Trained Medication Aide. (Tr. at 670-71.)  She is married and has a 21-year-old daughter from a previous marriage.  (Tr. at 674.)   In 2003, she held two full-time jobs as a home health aide.  (Tr. at 673.)  She started vomiting at work and did not know why.  (Tr. at 674.)  In January 2004, she was admitted to the hospital, because she could not stop vomiting.  (Tr. at 674, 682.)  She testified, "[t]hey found out that I was allergic to a zillion different molds and a lot of other things."  (Tr. at 682.)

At the time of the hearing, she was working at Cambridge Medical Center answering phones for two days, every other week.  (Tr. at 671-72.)  Her previous part-time job was a worker at a lab.  (Tr. at 672-73.)  She had participated in a full-time training period before one of her part-time jobs.  (Tr. at 679-80.)  During the training period, she had difficulty with confusion, rashes, coughing and sneezing, and nose bleeds.  (Tr. at 680-81.)  She continued to train for the part-time job, because she needed money to travel to Arizona to see her doctor.  (Tr. at 681-82.)

When Schmidt-Gossen is not at work, she sleeps.  (Tr. at 675.)  She is restricted from lifting more than five pounds with her right hand due to a wrist injury.  (Tr. at 675-76.)  She has four horses at her home, one of which is hers, but she cannot feed them herself.  (Tr. at 677.)  Her brother and daughter help her with the horses.  (Tr. at 684.)  She still rides her horse with assistance, but she cannot ride for very long.  (Tr. at 677.)  She cannot clean her house due to her allergies, and because she is exhausted.  (Tr. at 683.)

Schmidt-Gossen sees a doctor in Arizona.  (Tr. at 677-78.)  Her brother drives her to the airport, but she has a driver's license and drives herself to work.  (Tr. at 678.)  She does not believe she could do her switchboard job full-time, because after working eight hours she is exhausted, coughs a lot, and her back and throat hurt.  (Tr. at 678-79.)  Her allergies are life-threatening, and she has to carry an Epi-Pen with her at all times.  (Tr. at 685.)

Norman Mastbaum testified as a vocational expert.  (Tr. at 687.)  The ALJ asked Mastbaum whether a hypothetical woman of the same age, education and vocational background as Schmidt-Gossen, who had all of the diagnoses identified in the record, and was limited to light work, but the lifting restriction on the right hand alone was five pounds, and limited to unskilled work with brief and superficial contact with the public, co-workers and supervisors, and no rapid or frequent changes in work routine, could perform any of Schmidt-Gossen's past work.  (Tr. at 687-88.)  Mastbaum testified that she could not perform her past work, but could perform other work including clerical addresser, a job that can be performed from home, and clean room assembler, medical products visual assembler, and surveillance system monitor.  (Tr. at 689.)

The ALJ asked a second hypothetical question, adding that the hypothetical woman would be absent from work more than three unscheduled days per month, and had no use of the right arm, lifting less than ten pounds occasionally, standing and walking less than two hours, sitting less than two hours, thirty minute sit/stand option, no standing for more than fifteen minutes at a time, and walking every thirty minutes.  (Tr. at 690.)  Mastbaum testified such a person could not be competitively employed full-time.  (Tr. at 691.)

Schmidt-Gossen's counsel asked Mastbaum whether a person who had the environmental restrictions listed in Dr. Gray's report at Exhibit 21F could work in any of the environments

Mastbaum had suggested.  (Tr. at 692-93.)  Mastbaum testified that such a person could perform home based employment and clean room jobs, for which there were 1,000 and 2,000 jobs in Minnesota, respectively.  (Tr. at 693.)

###    C.    ALJ's Decision

The ALJ found Schmidt-Gossen had the residual functional capacity for light work, with additional limitations of lifting only five pounds when using her right upper extremity alone, and nonexertional limitations of brief and superficial contact with supervisors, co-workers and the public, and unskilled work.  (Tr. at 17.)  The ALJ rejected Dr. Tuorila's assessment of Schmidt-Gossen's physical restrictions, because Tuorila is a psychologist and does not have the expertise to make such a determination.  (Tr. at 18-19.)  The ALJ also rejected Dr. Tuorila's opinion that Schmidt-Gossen was psychologically incapable of work, because his opinion was vague and inconsistent with Schmidt-Gossen's daily activities.  (Tr. at 19.)  The ALJ adopted the opinions of the state agency consultants, because they were supported by the great weight of the medical evidence and consistent with Schmidt-Gossen's daily activities.  (*Id.*)  The ALJ did not discuss Dr. Gray's report or his conclusions.

## II.   ANALYSIS

Congress has prescribed the standards by which Social Security Disability benefits may be awarded.  "Disability" under the Social Security Act means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  "An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot,

considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).

There is a five-step sequential evaluation process that is used to determine disability. *See* 20 C.F.R. § 404.1520(4).  At the first step, if the claimant is not performing "substantial gainful activity," the evaluation continues.  (*Id.*)  At the second step, the evaluation continues if the claimant is found to have a severe medically determinable physical or mental impairment that meets the duration requirement.  (*Id.*)  At the third step, a claimant will be found disabled if he or she meets or medically equals the severity of a listed impairment.  (*Id.*)  If the claimant is found disabled at step three, the evaluation ends.  Otherwise the evaluation continues to step four, where the claimant's residual functional capacity is assessed and the ALJ determines whether the claimant can perform his or her past relevant work.  (*Id.*)  If the claimant cannot perform his or her past relevant work, the ALJ considers, at the fifth and final step of the evaluation, the claimant's RFC, age, education and work experience, to determine whether the claimant can make an adjustment to other work, if not, the claimant is found disabled.  (*Id.*)

The Court review the Commissioner's final decision to deny disability benefits to determine whether the decision of the Commissioner is supported by substantial evidence on the record as a whole.  42 U.S.C. § 405(g); *Baker v. Barnhart*, 457 F.3d 882, 892 (8th Cir. 2006). The Court "must consider relevant evidence which a reasonable mind would accept as adequate to support the Commissioner's conclusion as well as evidence that detracts from the Commissioner's decision."  *Scott ex rel Scott v. Astrue*, 529 F.3d 818, 821 (8th Cir. 2008) (quoting *Pyland v. Apfel*, 149 F.3d 873, 876 (8th Cir. 1998) (internal citations omitted)).

Schmidt-Gossen makes two arguments in support of her motion for summary judgment. First, she contends that she meets or equals a listed impairment. Second, she contends the ALJ's RFC determination is not supported by substantial evidence in the record.

### A.    Listed Impairments

Schmidt-Gossen contends that she meets or equals a listed pulmonary or neurological impairment. In reply to the Commissioner's contention that her argument is too vague to be addressed by the Court, Schmidt-Gossen argues that the "respiratory impairments . . . detailed in her statements in the Health & Environmental History Questionnaire (Tr. 403-408, 490-501) and noted by Dr. Gray (Tr. 439-440) are closely analogous to listed respiratory impairments, such as chronic obstructive pulmonary disease." Pl.'s Reply Mem. of Law in Supp. of Mot. for Summ. J. at 7 (Doc. No. 6). She also contends the neurological impairments that are detailed in the Health & Environmental History Questionnaire and noted by Dr. Gray are "closely analogous to listed neurological impairments, such as central nervous vascular accident and multiple sclerosis." *Id.* at 7-8. She further contends that she equals one of these impairments when they are considered together with her impairments of hypothyroidism, right wrist fracture, chemical allergies, latex allergies, mitral valve prolapse, rotator cuff tendonopathy and fibromyalgia. *Id.* at 8.

If a claimant has an impairment that meets the duration requirement and meets or equals a listed impairment in Appendix 1, the claimant will be found disabled without consideration of his or her age, education and work experience. 20 C.F.R. § 404.1520(d). If a claimant has an impairment that is not described in Appendix 1, the Commissioner will compare the findings related to the impairment with those for closely analogous impairments, and if they are at least of

17

equal medical significance, the Commissioner will find the impairment medically equivalent to the closely analogous listing. 20 C.F.R. § 404.1526(b)(2). If the claimant has a combination of impairments, none of which meets a listing, the Commissioner will compare the claimant's findings with closely analogous listed impairments, and if they are at least of equal medical significance, the Commissioner will find the combination of impairments medically equivalent to the listing. 20 C.F.R. § 404.1526(b)(3). The claimant has the burden to prove she meets or equals a listed impairment. *Carlson v. Astrue*, 604 F.3d 589, 593 (8th Cir. 2010) (citing *Johnson v. Barnhart*, 390 F.3d 1067, 1070 (8th Cir. 2004)).

Listing 3.02, chronic obstructive pulmonary insufficiency, is met or equaled based on a person's height and either their $FEV_1$ score, FVC score, single breath DLCO score, or "arterial blood gas values of $PO_2$ and simultaneously determined $PCO_2$."[7] 20 C.F.R. § 404, Subpart P, Appendix 1, § 3.02. Schmidt-Gossen contends that she meets or equals this listing based on Dr. Gray's report.

On August 9, 2006, when Dr. Gray tested Schmidt-Gossen's pulmonary function, her height was 69 inches, and her FVC score was 3.19 and $FEV_1$ score was 2.63. (Tr. at 454, 460.) At Schmidt-Gossen's height, the FVC score must be equal to or less than 1.65 to meet the listing. 20 C.F.R. § 404, Subpart P, Appendix 1, § 3.02(B). At her height, the $FEV_1$ score must be equal to or less than 1.45 to meet the listing. *Id.* at § 3.02(A). Schmidt-Gossen's pulmonary function

---

[7]     The results of spirometry tests are used to adjudicate under Listing 3.02(A) and 3.02(B). 3.00(E). In spirometry testing, FEV stands for forced expiratory volume, and FVC stands for forced vital capacity. *Id.* DLCO stands for diffusing capacity of the lungs for carbon monoxide, and the test is used in cases where there is documentation of chronic pulmonary disease, but the existing evidence, including properly performed spirometry, is not adequate to establish the level of functional impairment. 20 C.F.R. § 404, Subpart P, Appendix 1, § 3.00(F)(1). $PO_2$ is a measure of arterial blood partial pressure of oxygen, and $PCO_2$ is a measure of arterial blood partial pressure of carbon dioxide. 20 C.F.R. § 404, Subpart P, Appendix 1, § 3.00(F)(4).

test in July 2004, at Mayo Clinic, also produced FVC and FEV$_1$ scores greater than those required to meet or equal listing 3.02.  (Tr. at 325-28.)

Schmidt-Gossen notes that Dr. Gray diagnosed small airway obstruction, which he characterized as "dramatic reversible small airways obstruction."  (Tr. at 438, 440.)  Apart from the FEV and FVC scores, the Court cannot understand Dr. Gray's analysis of Schmidt-Gossen's pulmonary function tests (Tr. at 440-41), which refers to mold congruity factors, herpes viral titers and elevated tricothecenes interfering with protein synthesis.  Unfortunately, the ALJ did not discuss Dr. Gray's analysis.  Furthermore, the state agency physicians did not have Dr. Gray's report or treatment records, because they were created after the state agency consultants reviewed Schmidt-Gossen's file.  "[L]ongstanding policy requires that the judgment of a physician . . . designated by the Commissioner on the issue of equivalence on the evidence before the administrative law judge . . . must be received into the record as expert opinion evidence and given appropriate weight."  *Carlson v. Astrue*, 604 F.3d 589, 593 (8th Cir. 2010) (quoting Social Security Ruling 96-6p, 61 Fed. Reg. 34,466, 1996 WL 374180 (July 2, 1996)). For this reason, remand is necessary for further development of the record on the issue of whether Dr. Gray's diagnosis of small airways obstruction is a closely analogous impairment that equals the listing for chronic pulmonary insufficiency.

Schmidt-Gossen also asserts that she meets or equals listings for the neurological impairments of central nervous vascular accident and multiple sclerosis.  A central nervous vascular accident is a stroke.  *Hudson v. Bowen*, 870 F.2d 1392, 1394 (8th Cir. 1989).  Schmidt-Gossen was not diagnosed as having a stroke.  Listing 11.04 requires evidence of certain functional limitations caused by a stroke, but the listing can be equaled by a closely analogous impairment that does not have a separate listing. *See e.g.*, *Bellamy v. Astrue*, No. 08-CV-0628A,

2010 WL 2025489, at *9 (W.D.N.Y. March 30, 2010). Similarly, Listing 11.09 requires evidence of certain functional limitations caused by multiple sclerosis. Schmidt-Gossen was not diagnosed with multiple sclerosis.

Schmidt-Gossen contends Dr. Gray's report contains evidence that she equals these listings based on a closely analogous impairment. Under the heading "LABORATORY," Dr. Gray stated the following:

> Reviewing the results of her neuro testing, it is clear that there were 9.5 abnormalities in a battery of tests, which 0-2 abnormalities is considered acceptable, and 9.5 clearly is abnormal. She had problems with grip strength on the right, color vision bilaterally using the Lathoni Color Perception tests, visual field performance was diminished bilaterally indicative of occipital lobe abnormalities. Cognitive function showed diminished vocabulary score. Recall was compromised on verbal, recall, both immediate and delayed. Perceptual motor speed was abnormal for peg board and trails A and long-term or crystallized memory was compromised as exemplified by decreased performance on the overall information score.

(Tr. at 440.) Dr. Gray diagnosed toxic encephalopathy,[8] and without medical testimony in the record, the Court cannot interpret Dr. Gray's report to determine whether this is a closely analogous neurologic impairment to stroke or multiple sclerosis. Additionally, Schmidt-Gossen alternatively argues that she meets or equals Listing 12.02 for organic mental disorders,[9] based on her reported symptoms and Dr. Gray's findings. The ALJ did not discuss Dr. Gray's findings

---

[8]     *See supra* note 8.

[9]     The listing describes organic mental disorders as "psychological or behavioral abnormalities associated with a dysfunction of the brain. History and physical examination or laboratory tests demonstrate the presence of a specific organic factor judged to be etiologically related to the abnormal mental state and loss of previously acquired functional abilities." 20 C.F.R. § 404, Subpart P, Appendix 1, § 12.02. The required severity level for the listing is met when additional requirements in subparts A and B of the listing are met or when the requirements of subpart C are met. *Id.*

or conclusions, and the state agency reviewing physicians did not review Dr. Gray's treatment records or report.  Remand is necessary for further development on the issue of whether Schmidt-Gossen equaled Listings 11.04, 11.09 or 12.02.

### B.      The ALJ's RFC Determination

A claimant's RFC is what he or she can do despite his or her limitations.  20 C.F.R. § 404.1545.  An ALJ must determine a claimant's RFC by considering the combination of the claimant's mental and physical impairments.  *Baldwin v. Barnhart*, 349 F.3d 549, 556 (8th Cir. 2003).  However, it is the claimant's burden, not the Commissioner's, to prove the RFC.  *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001) (citing *Anderson v. Shalala*, 51 F.3d 777, 779 (8th Cir. 1995)).  The regulations provide "[i]n deciding whether you are disabled, we will always consider the medical opinions in the record with the rest of the relevant evidence we receive," and "[r]egardless of its source, we will evaluate every medical opinion we receive." 20 C.F.R. § 404.1527(b), (d).

There is nothing in the ALJ's decision to suggest that the ALJ considered Dr. Gray's opinion and evaluated it under the method described in 20 C.F.R. § 404.1527(d).  If, on remand, the ALJ does not find that Schmidt-Gossen equals a listed impairment, the ALJ must weigh Dr. Gray's opinion with the rest of the relevant evidence in assessing Schmidt-Gossen's RFC. If the ALJ finds reasons to grant Dr. Gray's opinion little weight, he must review Dr. Gray's records and analyze his opinions in the decision.  Because remand for further development of the record is necessary, the Court declines to grant Schmidt-Gossen's alternative request for reversal with an award of benefits.

The Court also notes that, in her Reply Memorandum, Schmidt-Gossen seems to contend Dr. Tuorila's opinion should be granted controlling weight. This is not the same argument Schmidt-Gossen raised in her Memorandum in Support of Plaintiff's Motion for Summary Judgment, where she opined that she met or equaled the listing for organic mental disorders based on the records and opinions of Dr. Gray and Dr. Tuorila. Nevertheless, Dr. Tuorila did not opine as to Schmidt-Gossen's mental residual functional capacity; he simply concluded that she was incapable of full or even part-time employment. (Tr. at 173.) However, Schmidt-Gossen was employed part-time at the time of the hearing. (Tr. at 671-72.)

The determination of disability is reserved to the Commissioner. "[O]pinions that a claimant is 'disabled' or 'unable to work' concern issues reserved to the Commissioner and are not the type of opinions which receive controlling weight." *Vossen v. Astrue*, 612 F.3d 1011, 1015 (8th Cir. 2010). Dr. Tuorila's later statement, (Tr. at 658), that Schmidt-Gossen's symptoms of depression severely limit all work activities is vague and cannot be the basis of a mental residual functional capacity, nor can the Court glean her work-related mental limitations from Dr. Tuorila's treatment notes. *See Peipgras v. Chater*, 76 F.3d 233, 236 (8th Cir. 1996) ("[a] treating physician's opinion deserves no greater respect than any other physician's opinion when [it] consists of nothing more than vague, conclusory statements") (citing *Thomas v. Sullivan*, 928 F.3d 255, 259 (8th Cir. 1991)). Therefore, the Court rejects Schmidt-Gossen's argument that Dr. Tuorila's opinion should have been granted controlling weight.

## III.    CONCLUSION

The ALJ committed two errors which require remand for further development of the record. First, the ALJ did not obtain medical testimony concerning equivalence with a listed

impairment based on Dr. Gray's pulmonary, laboratory, and neurological findings, and the evidence in the record as a whole.  The ALJ cannot rely on the state agency consultants' opinions in this regard, because they never reviewed Dr. Gray's records.  Second, in determining RFC, the ALJ is required to consider every medical opinion in the record, and he did little more than acknowledge that Schmidt-Gossen saw a physician in Arizona.   Therefore, the Court recommends remand for further development of the record consistent with this opinion.

Being duly advised of all the files, records, and proceedings herein, IT IS HEREBY RECOMMENDED THAT:

1.     Plaintiff's motion for summary judgment (Doc. No. 6) be GRANTED IN PART AND DENIED IN PART.

2.     The case be remanded pursuant to Sentence Four of 42 U.S.C. § 405(g), for further proceedings consistent with this opinion.

3.     Defendant's motion for summary judgment (Doc. No. 16) be DENIED.

4.     That judgment be entered accordingly.

Dated this 7th day of July, 2011.        _s/ *Jeanne J. Graham*_____
                                          JEANNE J. GRAHAM
                                          United States Magistrate Judge

### NOTICE

Pursuant to Local Rule 72.2(b), any party may object to this report and recommendation by filing and serving specific, written objections by **July 22, 2011**.  A party may respond to the objections within 14 days after service thereof.  Any objections or responses filed under this rule shall not exceed 3,500 words.  The district court judge shall make a de novo determination of those portions to which objection is made.  Failure to comply with this procedure shall forfeit review in the United States Court of Appeals for the Eighth Circuit